Davis, Judge,
delivered the opinion of the court:
Claiming that he had a binding contract with the defendant to sell and deliver to him some surplus tanks for scrapping, the plaintiff sues because the Air Force refused to hand over this material. He seeks the gain he would have realized if the sale had been consummated.
In February 1957, the Directorate of Procurement of the Air Force’s Northern Air Materiel Area for Europe (situated at Burtonwood, Lancashire, England)[1] called for sealed bids for the purchase as scrap of 450 surplus U.S. Army M-10 tanks then located at Cambridge. Neither the invitation nor *393 the proposed contract included any restriction against exportation of the scrap from the United Kingdom, although such a limitation had previously been proposed by the State Department to the Air Force. The “Provisions of Sale” required that the tanks be completely demilitarized by melting down within a prescribed period. With respect to “removal of property”, the proposal declared:
(1) Property will be removed by rail from Cambridge at British Army expense to rail-head nearest to the Contractors site. If rail-head enters the Contractors site property will be delivered direct. If no rail-head is available at Contractors site, Contractor will be responsible for moving tanks from rail-head to own site. (2) Tanks will be removed at the rate of 30 per week over a period of 20 weeks in coordination with agreement made with British Railways.
Before bidding, the plaintiff, a United States citizen engaged in buying and selling scrap, inquired of the disposal officer at Burtonwood whether the sale was confined to English bidders and also whether the defendant would deliver the tanks to the purchaser. The disposal officer, whose function it was to specify any special conditions applicable to the disposal of this surplus material, answered that plaintiff was free to bid and that the Government would have to ship the tanks to the successful bidder. Plaintiff then indicated that he would probably resell the material on the Continent and was told “that’s perfectly all right; go ahead and do it.” He was advised that an export license from the British Board of Trade would be necessary, but there was no indication whose obligation it would be to obtain such permission.
With this advice, plaintiff submitted an offer of $403,000. During this period the controlled price for steel scrap sold in the United Kingdom was $13 per ton; at such a level the scrap obtained from the 450 tanks would have been worth only about $169,000 if sold in the United Kingdom. There were seven bidders for the entire lot; the bids of the three highest (plaintiff and two English firms) substantially exceeded the amount which they would be able to realize if the scrap had to be resold at the controlled price.
Plaintiff, as the highest bidder, was awarded the contract- *394 of-sale on March 22, 1957, and was asked to forward the balance of the purchase price.[2] Almost immediately thereafter, the Headquarters of the Air Force in Washington realized that the valuable twin diesel engines in these surplus tanks did not have to be demilitarized, and that it would be wasteful to sell them as scrap. Burtonwood was directed to defer action on this award and on any further awards for tanks until this matter could be studied.
At about this time, plaintiff informed the contracting officer that he would probably resell the tanks to Norway and inquired about shipping. He was told that he would need a British export license. His reply was that it was the defendant’s obligation under the contract to ship the material and to make the necessary arrangements. The contracting officer then asked him to make the application to the British Board and said that, if he failed, “we’ll get it for you.” The Board of Trade refused to consider any application by plaintiff, as a private citizen, and he sought assistance from the American Embassy, unsuccessfully. He then turned to Burtonwood and, on April 17,1957, requested the contracting and disposal officers to help him obtain the export license; both refused. This negative position was upheld by Air Force Headquarters, which also encouraged Burtonwood to seek mutual rescission of the sale because of the improvident inclusion of the diesel engines. If plaintiff should refuse to consent to rescission, Burtonwood was directed to cancel the agreement unilaterally. Upon plaintiff’s refusal, the sale was nevertheless cancelled (late in April 1957) and his bid deposit returned. It is quite plain that the reason for this cancellation was the erroneous incorporation of the engines in the invitation.
In Washington in May 1957, during a conversation with a high Air Force legal officer, plaintiff was given this ground as the basis for the cancellation. He offered to remove the engines without cost to the defendant and to store them in bond or ship them back to England (also without cost). The Air Force official responded that, if plaintiff would agree to do all these things, the Government would reinstate the contract on those terms. Plaintiff asked about the export license *395 and was told that this was a problem for Burtonwood to iron out. The Air Force then instructed Burtonwood to reinstate the contract, deleting the diesels and crediting plaintiff for their weight; the directive also set forth certain other conditions which the record does not reveal. On June 12, 1957, the contracting officer wrote plaintiff that the letter of April 1957 cancelling the original contract “is hereby rescinded” and that agreement “remains in force subject to the negotiated amendment thereto, which will specifically reflect that the twin diesel engines presently contained in the M-10 tanks remain the property of the United States Government.”
Thereafter, at a series of conferences with Burtonwood, plaintiff offered (i) to exclude the engines from the sale; (ii) to remove them on the Continent (where he expected the tanks to be demilitarized) or, alternatively, at the English port from which the tanks would be shipped; (iii) if removal were accomplished on the Continent, to ship the engines at his own expense back to England or store them in bond (at no charge) at the point of tank-demilitarization. Since he had found a potential customer for the scrap at Dunkirk, he insisted, however, that the delivery of the tanks to the Continent would have to be undertaken by the defendant at its own expense, either as the shipper or on behalf of plaintiff. This insistence was rooted in plaintiff’s twin beliefs that the original contract required the defendant to deliver, and also that he himself would not receive an export license from the British Government without United States intervention. If the United States Government were the shipper, the British would certainly raise no questions as to export, and it was probable that they would honor an American request to grant a license to plaintiff.
Burtonwood would in no event agree that the Government should be the shipper or pay for delivery to the Continent,[3] and the Department of State (despite the urging of the Air Force) would not ask the Board of Trade to grant export permission to plaintiff. After some unhappy wrangling, Burtonwood informed plaintiff, in October 1957, that the *396 prior unilateral cancellation was revived, primarily because of plaintiff’s “inability to obtain a license from the British Board of Trade to export the tanks as scrap.” The material was later resold (for a much lower price) under an invitation which put the costs of shipping on the purchaser and also required a British export license (which the advertisement warned was “extremely difficult to obtain”) from any bidder intending to ship the property abroad.
The first question is whether the defendant validly can-celled the original contract because it mistakenly covered the still-useful diesel engines which were not required to be demilitarized and therefore should not have been offered as scrap. The bid-invitation and the contract contained a paragraph 11, entitled “Limitation on Government’s Liability,” and providing:
In any case where liability of the Government to the Purchaser has been established, the extreme measure of the Government’s liability shall not, in any event, exceed refund of the purchase price or such portion thereof as the Government may have received.
This paragraph, as plaintiff himself emphasizes, was inserted into the standard sales form mainly to meet those instances in which (1) a need for the property develops after it has been declared surplus and offered for sale, or (2) a serious mistake has been made, such as a grave price discrepancy between the true value of the item and the amount bid.
The original contract falls squarely under the second branch of these reasons for cancellation. Very soon after the award, the Air Force discovered the error in selling the valuable engines for scrap and began efforts to withdraw from the arrangement. Plaintiff recognized that the diesels could be salvaged and that a mistake of some kind had been made; he offered to modify the contract accordingly, but he would not consent to total rescission. In these circumstances the defendant was privileged, under paragraph 11, to cancel the contract, at that time, without liability other than for return of the bid deposit (which was done). In The North and Judd Mfg. Co. v. United States, 114 Ct. Cl. 355, 84 F. Supp. 649 (1949), this court applied a comparable contract clause so as to free the defendant of liability where surplus property *397 was withdrawn, after sale, because of previously unpredictable but newly urgent governmental needs.[4] The same principle should govern, under paragraph 11 of the plaintiff’s contract, to authorize cancellation for a significant error in the items offered for sale.
The next issue is whether the original contract was reinstated, minus the diesel engines, after plaintiff saw the high-echelon Air Force legal officer in Washington. Defendant says that a second oontract never emerged because the parties could not agree upon the necessary modifications incident to the deletion of the engines. We see the record differently. At his conference with the Air Force’s lawyer, plaintiff was told that the sale would be reestablished if he agreed to certain conditions concerning the engines. Bur-tonwood’s formal letter to plaintiff (dated June 12, 1987), rescinding the cancellation, declared that the earlier contract remained in force “subject to the negotiated amendment thereto” — which was described as one reflecting the defendant’s continued ownership of the engines. The disposition of those items was the only point left open; in other respects the initial contract would still control without any need for a second negotiation on terms. If the engine problem were settled, the whole agreement would be automatically revived.
The fact is that the subsequent discussions did not founder in the minor shoal of the diesels but on the major difficulties already inherent in the original contract. The plaintiff went as far as he reasonably could in assuming the burden of excising the engines from the tanks, while at the same time adhering to his interpretation of the contract as requiring the defendant to deliver the tanks wherever the British Bail-ways had a rail-head (even though that point was outside the United Kingdom) and to pay for the transportation. He agreed to remove the engines in the United Kingdom or on the Continent, as the defendant wished, and if the latter location were chosen he offered to pay for the expense of ship *398 ping the diesels back to Great Britain or of storing them on the Continent. The defendant could not reasonably reject these wide-ranging concessions (see Miller v. United States, 135 Ct. Cl. 1, 10-11, 140 F. Supp. 789, 794-95 (1956)), and they were not in fact rejected for themselves. The Air Force made other demands, not truly within the subject of the engines which had been left open for further negotiation, but related rather to the matter of shipment which had been covered by the original contract. Plaintiff could not accept these demands without abandoning his construction of the delivery provisions of the original contract. The discussions collapsed over that point, not over the engines.[5]
Accordingly, we hold, on two alternative grounds, that the first contract was fully reinstated (with the engines excluded) : first, the parties actually agreed on the engines, the only matter left for further negotiation, and parted company solely on issues no longer open for negotiation; second, since the only subject properly left for discussion was so narrow and the plaintiff was willing to agree to any reasonable requirement imposed by defendant, the latter could not arbitrarily refuse (as it did) to come to terms. Cf. Note, 49 Va. L. Rev. 773, 784-785 (1963); Stevens v. Howard D. Johnson Co., 181 F. 2d 390, 393 (C.A. 4, 1950); Weiner v. Pictorial Paper Package Corp., 20 N.E. 2d 458, 462-63, 303 Mass. 123 (1939); Kresge v. Taylor, 194 Fed. 379 (C.A. 3, 1912).[6]
When the contract was reinstated, with the modification as to the engines, it carried with it the same general terms and the same meaning it originally had — whatever they may have been. This is undoubtedly what the parties intended at the *399 time plaintiff spoke to the Air Force legal officer and the defendant sent its letter of June 12, 1957, formally notifying plaintiff of the reinstatement of the sale and the rescission of the earlier cancellation. That letter, as we have said, can bear no other interpretation than that the contract was again put fully in force, subject to agreement on the engines. The ensuing meetings uncovered the disparity in the parties’ understanding of the delivery provisions of the original contract, but by that time the contract had already been reinstated by the June 12th letter, with the proviso that an accord on the engines would have to follow. That condition subsequent was, we have held, thereafter fulfilled. The basic contract became wholly effective once more, without alteration except as to the engines.
We are thus required to grapple with the meaning of the delivery provision of the contract. On that pivot liability turns, for, as defendant concedes, “if the United States did in fact assume an obligation to ship the tanks outside the United Kingdom, and there to make formal delivery of them to the successful bidder,” the matter of British export licenses would be irrelevant and the defendant could not urge “that its failure to deliver is excused by the difficulties plaintiff experienced with British export authorities in an attempt to obtain an export license.” We agree with plaintiff that defendant must be held to have obligated itself to deliver the tanks to Dunkirk, where British Railways had a rail-head and the plaintiff had found a plant.
The “Removal of Property” clause, supra, referred generally to an “agreement with British Railways” and provided that the property would be removed “by rail from Cambridge at British Army expense to rail-head nearest to the Contractors site”; “if the rail-head enters the Contractors site property will be delivered direct”; but “if no rail-head is available at Contractors site, Contractor will be responsible for moving tanks from rail-head to own site.” The natural understanding of these unqualified words would be that: (a) the defendant had an agreement with the British Railways and the British Army under which the former would deliver the tanks for the United States (but at the British Army’s expense) to a rail-head at or near the con *400 tractor’s site; (b) the defendant undertook in this fashion to ship and make delivery to that rail-head; (c) the contractor’s site was any point chosen by the contractor to receive the goods; (d) nothing being said as to delivery being confined to the United Kingdom, the obligation would extend as far as the British Railways had a rail-head; and (e) if an export license were needed for delivery to a rail-head of British Railways on the Continent, the defendant, as part of its obligation to deliver, would either obtain the license or arrange for omission of that requirement. This was plaintiff’s contemporaneous understanding of the delivery provision. It is also supported by the disposal officer’s statement to plaintiff (before the bidding) that it would be “all right” for him to “wind up” with the tanks on the Continent, as well as by the contracting officer’s advice (shortly after the award) that plaintiff should seek an export license and “if you don’t succeed, we’ll get it for you.” The two other bidders who exceeded the domestic controlled price for scrap must likewise have construed the contract as authorizing export.
We cannot accede to defendant’s position that the contract as a whole demonstrates the error in this reading of the “Removal of Property” clause. By themselves, the standard-form provisions that this was a “where is” sale, “f.o.b. conveyance” at the point of loading, could suggest that the Government was not bound to deliver; but those conventional clauses must in this instance yield to, and be interpreted in the light of, the specially-tailored removal-and-delivery article. See Callahan Construction Co. v. United States, 91 Ct. Cl. 538, 634-35 (1940). Nothing else in the contract demanded that the transaction be confined to the British Isles. The unspecific term “Contractor’s site” (in the removal clause) can easily apply to any location designated by the purchaser, and need not be limited to a smelting place within the United Kingdom. The contract did require the successful bidder to furnish proof of smelting, within one year, to the defendant’s disposal officer and to the British Customs and Excise Officer at Cambridge, but such proof could be supplied to that officer at Cambridge, whether the smelting were done in Kent or France or Belfast. Air Force *401 personnel were to inspect the demilitarization of the tanks each week; that, too, could be done even if the plant were on the Continent or in Ireland. Stress is also put upon the transportation “by rail” promised by tbe defendant, but rail carriage does not exclude use of a rail-ferry (which is often a part of rail transportation). The removal article provides flatly for delivery to any “rail-head” of the British Railways at or near the contractor’s site; the record shows that those Railways did maintain a rail-head at Dunkirk, serviced by a rail-barge-ferry.[7] In short, the other terms of the agreement are consistent with what the unqualified words of the removal article imply and what plaintiff thought from the beginning, i.e., that the defendant would make delivery to a British rail-head on the Continent if that turned out to be near the location chosen by the contractor.
This is the construction of the contract we gather from its terms and background, without benefit of extraneous presumptions or special rules of interpretation. But if this reading be still considered questionable, we must resolve the doubt against the defendant as the drafter of the special removal provision; the plaintiff’s understanding of that clause was wholly reasonable in the known circumstances. See, e.g., W. H. Edwards Engineering Corp. v. United States, 161 Ct. Cl. 322, 331-32 (1963); Peter Kiewit Sons' Co. v. United States, 109 Ct. Cl. 390, 418 (1947); Western Contracting Corp v. United States, 144 Ct. Cl. 318, 326 (1958) .[8]
Once it is recognized that the Government had assumed the obligation to deliver the tanks to the rail-head at Dunkirk, the breach becomes plain — as defendant admits. The duty to ship and deliver necessarily encompassed the subsidiary duty to obtain an export license for plaintiff or to by-pass that requirement by shipping the material as the Federal Government’s own. Without that secondary obligation, the primary promise would have no meaning; and the defendant was surely in a better position to fulfill its agreement by *402 obtaining the permit (or a waiver) than plaintiff, a private American purchaser.[9] Similarly, the defendant, having bound itself to deliver abroad, could not refuse to take the necessary steps because the State Department felt that it was inopportune to ask the British Government for an export permit. The doctrine of “public and general” “sovereign acts”, laid down in Horowitz v. United States, 267 U.S. 458 (1925), does not relieve the Government from liability where it has specially undertaken to perform the very act from which it later seeks to be excused. See The Sunswick Corp. v. United States, 109 Ct. Cl. 772, 798, 75 F. Supp. 221, 228 (1948), cert. denied, 334 U.S. 827; cf. Stebel v. United States, 108 Ct. Cl. 35, 44-45, 69 F. Supp. 221, 222-23 (1947); Miller v. United States, 135 Ct. Cl. 1, 140 F. Supp. 789 (1956); Metal Exports, Inc. v. United States, 137 Ct. Cl. 258, 146 F. Supp. 951 (1957). In any event, it is clear that the Air Force refused to adopt the other feasible method of exporting the tanks — shipping them as property of the United States for which no license would be required — simply because the British Government would not pay for that type of transportation (see footnote 3, supra). There was no conceivable foreign policy obstacle to following that course, only a pecuniary drawback.[10] The existence of this court is proof enough that the desire to save money is a poor reason to break an outstanding promise. Cf. Lynch v. United States, 292 U.S. 571, 580 (1934).
Defendant’s last hope is paragraph 11 of the contract, quoted supra, which purports to restrict the “extreme measure of the Government’s liability” “in any event” to a refund of “the purchase price or such portion thereof as the *403 Government may have received.” We have already ruled, earlier in this opinion, that paragraph 11 does play a valid part where the Government cancels the sale for such good cause as a newly-discovered need for the property or a significant mistake as to the property offered for sale. But we will not construe the general terms of the paragraph as absolving the Government from all damages where it breaches the contract, without such good reason, because it disagrees with the contractor over the meaning of some provision of the agreement. To read the clause in that unlimited fashion — excusing all damages for any type of breach— would come close to (if not reach) the pit of voidness; the Government would in effect promise nothing although the other party would supposedly be bound.[11] Moreover, we have held that general provisions seeming to immunize the Government from paying damages due to its own breach or negligence should be construed, if possible, as not covering serious breaches, especially willful defaults, causing important loss to the contractor. Ozark Dam, Constructors v. United States, 130 Ct. Cl. 354, 359-60, 127 F. Supp. 187, 190-91 (1955). That admonition cautions us to exclude from the generality of paragraph 11 a significant, willful, and unjustified breach, like that present in this case, destroying the heart of the plaintiff’s agreement and bringing grave loss. In such cases the normal damage rules should continue to apply.
Plaintiff’s net damages have been ascertained for the most part, but not completely. He agreed, in June 1957, to sell the tanks (without the engines) to a French company near Dunkirk at $62 per metric ton, i.e., at the lower range of the then “world-wide” market price for scrap of this type. This would have brought him $669,755. If the contract with the defendant had been performed, he would have had to pay $369,136.38 as the purchase price of the tanks (less the *404 engines). He would also have had some $35,000 in miscellaneous expenses, and another $35,380.50 in transporting the tanks (with the engines) from the Port of Dunkirk to the French company’s nearby plant. That firm had agreed to remove the engines and restore them to plaintiff, but he would then have incurred the expense of either storing the engines for the defendant on the Continent for a reasonable time, or of transporting them back to England. We do not know the extent of these probable costs, and the case will therefore have to be returned to the Trial Commissioner to determine the higher of either (a) the expense of storing the engines for the defendant at or near Dunkirk for a reasonable time or (b) the cost of transporting the engines from the French company’s plant back to Cambridge, England.[12] It is fair to charge the plaintiff with the greater of these two amounts since we have held that the original contract was reinstated only because plaintiff agreed to all reasonable demands the Air Force could make with respect to the disposition of the engines; we must assume that the defendant could have asked either for storage or for reshipment back to England, and that plaintiff would have paid for the costs of either election. Except for these costs, plaintiff’s damages amounted to $230,238.12. The expense of storage or reshipment will be deducted from that amount.
Plaintiff is entitled to recover, and judgment is entered to that effect. The precise amount of recovery will be determined, in accordance with this opinion, under Rule 38 (c).
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Franklin M. Stone, and the briefs and arguments of counsel, makes findings of fact as follows:
1. The plaintiff is an individual who has been doing business under the trade name of M. & E. Equipment & Parts Company, with his headquarters and principal place of business in New York City, New York, since 1954. From 1945 to sometime in 1957, plaintiff was engaged in the business of *405 buying and selling Government surplus property of a varied nature, including, principally, automotive parts and scrap.
2. Under date of February 12, 1957, defendant, acting through, the Directorate of Procurement, Headquarters, Northern Air Materiel Area, Europe, United States Air Force, Burtonwood, Nr. Warrington, Lancashire, England (hereinafter referred to as the “disposal agency”), invited sealed bids to be submitted to it for the purchase of 450 surplus U.S. Army M-10 tanks, as scrap, which the parties agreed weighed approximately 26,000,000 pounds, located at or near Cambridge, England. The invitation was numbered AF (61-703) S-57-19 and was on Standard Form 114, revised August 1950, prescribed by General Services Administration, Personal Property Management Regulation No. 3.
3. Since the proposed sale involved property having a total acquisition cost of $250,000 or more, the terms of the sale had been submitted, in accordance with regulations, to the American Embassy in London for review by the State Department prior to advertising for bids. That was done by a letter dated November 16, 1956, from the Assistant Adjutant, Headquarters, Third Air Force, U.S. Air Force, Middlesex, to the Third Secretary of Embassy, American Embassy in London. The proposed terms were stated to be as follows:
* * * * *
c. Proposed Terms of Sale:
(1) Bid: Sealed Bid Sale
(2) Currency: British Sterling
(3) Restriction on use of property: Complete demilitarization reduce to scrap in accordance with provisions of Department of Army Technical Bulletin tb ORD 412 dated 18 June 1955. These vehicles will be shipped by the British Army Authorities direct to the successful bidders smelting plant.
d. Prospective Buyers: United Kingdom Bidders[13]
e. Taxes, duties, etc: Not applicable.
In this connection, it should be explained that the Department of State had the responsibility and authority to advise other Government agencies and departments on foreign policies and other matters concerned in the disposal of *406 excess Government property located in foreign countries. In disposal of property with an acquisition cost in excess of $250,000 by the military services as well as other executive agencies, the appropriate Embassy would be informed of a particular sale. The Embassy would forward the proposal to the State Department in Washington, D.C., with any comment it might have and in due course, the Department of State would grant or withhold approval, or approve subject to modifications being made or conditions imposed.
4. The Department of State concurred in the disposal as described in the above-quoted letter. That concurrence was set forth in a letter dated January 2, 1951, from the same Third Secretary of the defendant’s London Embassy to the Third Air Force Headquarters, Middlesex, wherein, among other things, it was stated:
We have been asked to inform you that the Department of State concurs in the disposal as described in the referenced letter, with the understanding that complete that complete [sic] demilitarization and scrapping (paragraph C(3) of your letter) will mean that the successful bidders will not be able to salvage any parts of the tanks, and on the condition that if demilitarization is not carried out at Burtonwood but rather by the successful bidder or some other contractor, USAF personnel supervise this operation in order to assure conformance with the indicated standards. While it appears that the resulting scrap would be used only within the U.K., the Department wishes to suggest that the sales contractor include a warranty designed to ensure that the property will be used in the U.K. or, if exported, will only be exported to a destination acceptable to the United States.
No such provision as that suggested in the closing sentence, quoted above, appears in the invitation for bids or in the contract.
5. (a) At some unspecified date between the issuance of the invitation for bids, dated February 12,1957, and March 19, 1957, the closing date for the receiving of bids relating to the sale of the tanks involved herein, plaintiff was in the office of the defendant’s disposal officer at Burtonwood. At this time plaintiff saw a copy of the invitation to bid. After reading the invitation to bid, the plaintiff asked the disposal *407 officer if the bidding was restricted to English bidders and was told that the bidding was not restricted, and that he conld bid on the material.
(b)The Provisions of Sale set forth in the invitation to bid included, among other clauses, the following:
PROVISIONS OF SALE
* * * * $
REMOVAL OP PROPERTY
d. (1) Property will be removed by rail from Cambridge at British Army expense to rail-head nearest to the Contractors site. If rail-head enters the Contractors site property will be delivered direct. If no rail-head is available at Contractors site, Contractor will be responsible for moving tanks from rail-head to own site. (2) Tanks will be removed at the rate of 30 per week over a period of 20 weeks in coordination with agreement made with British Railways.
The above provisions prompted plaintiff to ask certain questions of the disposal officer relating to the obligation of the Government to ship the material to the highest bidder, because plaintiff did not consider it to be the usual practice of the Government to ship material. In response to plaintiff’s direct inquiry, the disposal officer advised plaintiff that if he was the highest bidder, the Government would have to ship the material to him.
(c) Thereafter, in response to the disposal officer’s inquiry as to where plaintiff intended to sell the material, plaintiff indicated that he was uncertain as to where the material would be sold; that he might sell to a buyer outside the United Kingdom, possibly in the United States, Norway, or on the continent, but finally stated that since the British Railway did not go to the United States, he “probably would wind up on the continent”; whereupon the disposal officer said, “that’s perfectly all right; go ahead and do it.”
(d) There also was some discussion between plaintiff and the disposal officer with respect to whether or not the tanks could be exported from the United Kingdom. The disposal officer advised that any exportation would have to be ap *408 proved or licensed by the British Board of Trade in London; but the record does not show whether or not he advised plaintiff that the necessary approval or license required for exportation would have to be obtained by plaintiff or defendant.
(e) The function of the disposal officer, who was a part of the Directorate of Supply, was to list surplus property available for sale and to specify any special conditions applicable to the disposal.
6. On or about March 19,1957, plaintiff, who was the first bidder, submitted a bid of $403,000 ($.0155 per pound) for the tanks which was the highest bid received, and at the same time made a deposit of $80,637.60. The following bids, excluding the bids of two other firms which bid on fewer than the entire lot of 450 tanks, were received :
1. M & E Equipment & Parts Company, New York, N.Y. (143,907 pds, 16 sh), $403,000;
2. F. B.. Evans, Leeds Ltd., Branley, Leeds 13, England, 108,333 pds, 6 sh, 8pns. ($303,332.40);
3. H. G. Pounds, Portsmouth, England, 100,080 pds, 17 sh, 6pns. ($280,224.00);
4. Thos. W. Ward Ltd., Sheffield, England, 54,156 pds, 13 sh, 4pns. ($151,636.80);
5. A. King & Sons, Norwich, England, 34,821 pds, 8 sh, 7pns. ($97,498.80);
6. Manners Scrap Metal Company, Ilkston, Darbyshire, England, 13,091 pds, 13 sh, 4pns. ($36,654.80).
7. The parties are in sharp dispute on the question of the control price that prevailed in the United Kingdom, at the time the contract was entered into, on the steel scrap recoverable from these tanks. The evidence of record relating to this matter is confused; but it is clear that the varying prices shown in the record refer to different grades of steel scrap. The steel scrap in these tanks was unprepared, uncut, number 2 grade, rather than prepared, cut, number 1 grade. On balance, the evidence establishes that the control price on the sale of the steel scrap involved herein was nearer the $13.00 per ton figure claimed by plaintiff than some speculative price within a range of $21.50 to $32.63, depending upon its grade, as contended by defendant. Using the 26,000,000 *409 pound approximate overall weight figure of the tanks as a factor, it is concluded that the total control price on the sale quantity of the steel scrap was $169,000, and that the quotations of the three highest bidders were substantially in excess of this amount.
8. Plaintiff’s bid was accepted, the contract awarded to him, and he was advised to this effect by letter dated March 22,1957, which reads, in part, as follows:
$ ‡ $
You have been awarded item No. 1 as shown on the contract for a total of $403,000.00. A copy of contract A'F (61-703 )-‘S-6 is forwarded to your information and retention.
Having placed a deposit of $80,637.60 there is now a balance of $322,362.40. It is requested that this balance be forwarded at your earliest convenience in the form of a bankers draft and being made payable to the Treasurer of the United States. On receipt of this a certificate of clearance will be forwarded, which will enable you to commence collection.
9. Sometime subsequent to the receipt of the above letter, in an undated letter to the contracting officer, plaintiff advised that the balance of the purchase price due on the contract was in its bank in London and that upon advice as to when it would be convenient to pick up the certificate of clearance, he would send a messenger to Buttonwood for it with a check for the balance as he was anxious to begin moving the material as soon as possible.
10. The General Sales Terms and Conditions and Provisions of Sale set out in the Invitation to Bid include, in addition to the clause relating to Removal of Property, supra[14] the following pertinent provisions:
GENERAL SALES TERMS AND CONDITIONS
* * * * *
2. condition or property. — All property listed herein is offered for sale “as is” and “where is”, and without recourse against the Government. If it is provided herein that the Government shall load, then “where is” means f.o.b. conveyance at the point specified in the invitation. The description is based on the best available *410 information, but the Government makes no guaranty, warranty, or representation, expressed or implied, as to quantity, kind, character, quality, weight, size, or description of any of the property, or its fitness for any use or purpose, and no maim will be considered for allowance or adjustment or for rescission of the sale based upon failure of the property to correspond with the standard expected; ■this is not a sale by sample.
‡ ‡ ‡ &
5. paxmeNT. * * * Unless otherwise specified by the Government, payment of the full purchase price * * * must be made prior to the date specified for removal and prior to delivery of any property. * * *
6. title. — Title to the items of property sold hereunder shall vest in the Purchaser as and when full and final payment is made * * * except if the contract provides that loading will be performed by the Government, title shall not vest until such loading and such payment are completed. * * *
7. DELIVERY and removal oe property. — The Purchaser shall be entitled to obtain the property upon vesting of title of the property in him, unless otherwise specified in the Invitation to Bid. Delivery shall be at the designated location, and the Purchaser shall remove the property at this [sic] expense. * * *
$ $ * 3< #
11. LIMITATION ON GOVERNMENT’S LIABILITY. — In any case where liability of the Government to the Purchaser has been established, the extreme measure of the Government’s liability shall not, in any event, exceed refund of the purchase price or such portion thereof as the Government may have received.
12. verbal modieioattons. — Any oral statement by any representative of the Government, modifying or changing any conditions of this contract, is an expression of opinion only and confers no right upon the Purchaser.
* * * * ¡Ü *
PROVISIONS 0E SALE
DEMILITARIZATION
a. In accordance with Department of the Army Technical Bulletin, T.B. Ord 412, dated 18 June 1955, all tanks will be completely demilitarized by melting down as listed below:
*411 b. The Contractor will warrant that all property in this contract will not be sold in whole, or in part, in its present form.
c. The Contractor also warrants that all property in this contract will be received at a foundry for melting purposes.
sH # # Sj< #
INSPECTION BY USAF PERSONNEL
e. Complete demilitarization of tanks at contractors plant will be inspected weekly by USAF personnel (Disposal Division, Burtonwood).
* $ $ # #
PROPERTY
g. Property for sale consists of 450 M.10 Tanks— Motor Carriage, approximately 25 tons each, estimated overall weight 26,000,000 lbs. Unit of Sale will be lbs.
SMELTING QE PROPERTY
IMPORTANT: THE SUCCESSFUL BIDDER WILL FURNISH PROOF TO THE CHIEF, DISPOSAL DIVISION, BURTONWOOD, AND HER majesty’s CUSTOMS AND EXCISE OFFICER, CAMBRIDGE STATION, 24 BATEMAN STREET, CAMBRIDGE, THAT ALL ITEMS LISTED IN THIS CONTRACT HAVE BEEN SMELTED. THE CONTRACTOR GUARANTEES THAT ALL MATERIAL WILL BE SMELTED WITHIN TWELVE (12) MONTHS FROM DATE OF AWARD. ADDITIONAL TIME WILL ONLY BE ALLOWED UPON WRITTEN REQUEST FROM THE CONTRACTOR TO THE PURCHASING AND CONTRACTING OFFICER, AND APPROVAL BEING OBTAINED IN WRITING.
14. On March 28, 1951, Headquarters, U.S. Air Force, Washington, D.O., notified the Commander at Burtonwood, in substance, that the Department of Defense had received information that the tanks offered for sale were 'being required to be demilitarized and had advised that under Army regulations (tb-ord-654) the twin diesel engines used in M-10 tanks did not require demilitarization; and the Commander was directed to hold in abeyance any further awards under the sale pending receipt of requested clarification of this matter.
12. On or about April 5,1957, the same Headquarters advised the Commander at Burtonwood that no further action should be taken on either the award or delivery of the subject tanks; that the matter was currently under study and the Commander would be advised of the course of action to pur *412 sue; and request was made that Headquarters be advised of the net recovery in dollars which could be expected by the United States if the tanks were offered for sale without the requirement for the demilitarization of the engines.
There is no evidence in the record that a reply was ever made to the above message and inquiry.
13. Along in the early part of April 1957, the plaintiff informed the contracting officer that it looked like he might be selling the tanks to the Noi'wegian State Steel Mills and asked him to make the necessary arrangements to ship the material to Norway. The contracting officer told the plaintiff that he would have to see about obtaining an export license. The plaintiff advised the contracting officer to the effect that it was the function of the defendant to ship the material according to the terms of the contract and to make any arrangements that might be necessary incident to shipment. The contracting officer told the plaintiff to go to the British Board of Trade and ask for a license to export and when the plaintiff said that this was out of the question because the Board would not consider giving a license to a private company to export scrap, the contracting officer told him to go ahead anyway and stated, “if you don’t succeed, we’ll get it for you.”
14. Within a few days thereafter, the plaintiff personally contacted an official of the Export Licensing Branch of the British Board of Trade in London and indicated his desire to file an application for a license to export scrap from the tanks to Norway or the United States. Plaintiff was advised by this official that he could file an application, but that it would not be processed, as favorable consideration could not be given to any application to export scrap; but despite this fact, plaintiff caused an application to be filed by his shipping agent because plaintiff was not domiciled in England and was unable to file an application himself.
15. On or sometime after April 10,1957, a day or two after plaintiff called at the office of the British Board of Trade and made an unsuccessful effort to obtain a license to export the scrap, plaintiff personally contacted an official of the American Embassy in London, and requested assistance in Obtaining a license to export the tank material. This offi- *413 eial was the same person to whom a letter was directed under date of November 16, 1956, by the Third Air Force Headquarters, which related to the proposed sale of these tanks.[15]
This official also was the same person who, in January 1957, forwarded the approval of the ’State Department to the proposed sale of the tanks. (See finding 3.)
In response to plaintiff’s request for assistance, this official told the plaintiff that this was a matter for British authorities; that it was not within the jurisdiction of the Embassy to intervene in things of this kind and that nothing could be done without instructions from Washington, D.C., or Burtonwood, but that he would look into the matter and let plaintiff know if he could do anything for him.
Plaintiff told the official that he expected to apply for a waiver of the contract terms with a view to salvaging rather than scrapping, the diesel engines in the tanks.
At the time of the talk with plaintiff, this official had not seen the contract entered into between the plaintiff and the defendant; but he had seen correspondence containing comments of the Department of State on the Air Force letter setting forth the proposed sale which this official had submitted to the State Department in Washington, D.C., and was under the impression that the scrap was intended for sale in the United Kingdom to United Kingdom bidders in British Sterling, and that the State Department had recommended a provision be included in the sale that the tanks be scrapped under the supervision of Air Force personnel.
16. After plaintiff left the Embassy on the above occasion, the official telephoned the disposal officer at Burtonwood and advised him of plaintiff’s visit. The Embassy also advised the State Department in Washington, D.C. of this situation and plaintiff’s request for assistance and requested instructions. The State Department subsequently advised the Embassy in effect not to do anything for plaintiff that would facilitate the exportation of the scrap from Britain.
17. On April 17, 1957, plaintiff informed the contracting officer that he could not obtain a license from the British Board of Trade to export the scrap unless the contracting officer wrote a letter to the Board advising to the effect that *414 tlie tanks were the property of tbe United States Air Force and mere “flow” material sold to the plaintiff for demilitarization. The contracting officer indicated that he did not know what “flow” material was, bnt stated that in any event, he did not have authority to write such a letter to a foreign Government agency and he refused to do so. Plaintiff stated that without the letter requested, he would stand to lose from $10,000 to $15,000 in expense money and interest and also possibly would be liable to suit by the Norwegian State Steel Mills to which he, had committed the tanks. Immediately after this talk with plaintiff, the contracting officer telephoned the disposal officer, advised him of the substance of the above conversation with plaintiff and directed him not to give plaintiff anything or tell him anything. Immediately thereafter, plaintiff called upon the disposal officer and asked him to write the same kind of a letter to the British Board of Trade which the contracting officer had refused to do, and the disposal officer also declined to write such a letter.
18. On or about April 19, 1957, a message was sent from the U.S. Air Force Base at Burtonwood to Headquarters, United States Air Force, Washington, D.C., relating to the sale of these tanks, and in reply thereto, Headquarters sent a telegram to Burtonwood which reads, in pertinent part, as follows:
* * * U.S. Embassy London has advised the State Department, Washington, D.C. that Freedman representing purchaser (A) plans to apply for waiver of contract terms to permit purchaser to salvage engines and other parts from tanks, and (B) has appealed to U.S. Embassy for assistance in obtaining export license from British: for purpose of shipping tanks to Norse-Demverk, Oslo, Freedman claims to have committed himself to start deliveries to Norse-Jernverk [sic] on May 1, 1957 State Department, Washington has advised U.S. Embassy London, that (A) neither Freedman nor any other alternative bidder should be granted any exceptions or waiver to the terms of conditions of the IFB or contract, and (B) that the U.S.' Embassy should refrain from asking the British Government to grant an exception and permit the export of the scrap or any components from the United Kingdom by the purchaser of the tanks. It now appears that the requirements of the IFB to the effect that the twin diesel engines in *415 each tank be demilitarized and mutilated was an error. Accordingly, it is considered to be the Government’s best interests that the sale to M&E Equipment and Parts Company, New York, be cancelled. It is therefore requested that the following action be taken by your command in the order indicated.
First.
This Headquarters subscribes to the action taken by the State Department, i.e., that (A) no waiver or deviation whatsoever, shall be considered or granted to M&E Equipment and Parts Company, in respect of any of the terms and conditions of the IFB and Contract AF'(61-703)-s-59-19, and (B) that no action shall be taken by the Air Force to assist M&E Equipment and Parts Company, in obtaining an export license from the British Government.
Second.
It is conceivable that the inability of the purchaser to obtain a waiver of contract terms and/or the export license would make the purchaser amendable [sic] to the cancellation of the contract of sale. Every effort should be made by your command to encourage the purchaser to cancel the contract, for whatever reason, of his own volition.'
Third.
In the event the purchaser does not desire to cancel this contract, you are requested to cancel forthwith the Contract AF (61-703) -s-59-19 with the M&E Equipment and Parts Company, New York, since such action is in the Government’s best interests.
Fourth.
Thereafter, the sale of the tanks will be re-advertised, provided however that the twin diesel engines in each tank shall not repeat not be sold as scrap. Available information indicates that these engines have a market value over and above scrap value. Appropriate action shall be taken by your command to fully explore the market value of the diesel engines prior to any re-advertisement of the sale of the tanks. * * *
19. In an effort to comply with the directive received from Headquarters of the United States Air Force to make every effort to encourage the plaintiff to voluntarily cancel the contract, a conference was called and held at Burtonwood on *416 April 25, 1957, which was attended by the plaintiff and various representatives of the Air Force including, among others, the contracting officer and the 'Director of Procurement at Burtonwood. The Director of Procurement made a memorandum dated April 26, 1957, covering this conference which states, in part, as follows:
$ * * $ *
It was initially established that:
a. The contractor was proceeding, and intended to proceed, in good faith to comply with all provisions of the contract.
b. He had made a contractual commitment to a smelting firm, Norske-Jernverk, Oslo, Norway, for the shipment of approximately 12,000 tons of scrap which he expected to produce from subject contract.
c. He expected the US Government to effect the necessary clearance permitting the shipment of the scrap from the United Kingdom to Norway.
After a lengthy discussion, plaintiff declined to request a cancellation of the contract. The above-mentioned memorandum contains the following additional pertinent statements:
In these discussions the contractor presented this one predominant factor as a basic reason for his position: He was committed to the Norske-Jernverk Mill, Norway, to deliver approximately 12,000 tons of scrap beginning about 1 May 57, which scrap he must generate from subject contract. (He added that his firm had incurred other expenses, for example, bank interest on approximately $400,000.00 and incidental expenses incurred by travel, pursuit of this business, etc.)
At this point the contractor made two specific counter-proposals :
a. He stated that he 'had been assured of an award which he expected to execute the next day with the British Ministry of Supply for the purchase of approximately 300 identical tanks (containing the same twin GMC diesel engines). (The condition of these tanks is unknown to this office.) He offered to supplement subject contract 'by deleting the requirement to demilitarize the engines, and in consideration thereof he would offer to pay the additional amount which would reflect the same price he offered for each tank under the Ministry of Supply sale. As he explained, he paid approximately $900 per tank on subject contract and $1607 for *417 each, tank under the Ministry of Supply contract. Therefore, 'he would offer an additional $318,150.00 to subject contract as consideration for deleting the requirement to demilitarize the engines.
b. The Contractor’s other counter-proposal was to supplement the contract permitting him to proceed with the demilitarization of each tank with the exception of the engines, which would remain the property of the United States Government and which he would set aside either at the storage site, at the smelting site, or wherever the U.S. Government desired. In consideration therefore he was to be credited for the scrap weight of the engines and the cost of removal and such other work as required.
The contractor also added that even in case he would be required to make disposal of the tanks in the United Kingdom he still would not ask for release from the contract.
In view of the position taken by plaintiff against cancellation of the contract and that the Director of Procurement did not have authority to accept any counter-proposals, the Director telephoned an official in the Procurement Policy Division, Deputy Chief of Staff Materiel, Headquarters, United States Air Force, in Washington, D.C., reported developments up to this point in the conference and requested instructions. The Director was advised that the contract should be cancelled and plaintiff’s deposit returned to him before the contract was terminated. Thereupon, a letter, together with the check referred to therein, was handed to plaintiff which reads as follows:
You are hereby notified that Contract AF (61-703) s-6 is hereby cancelled in its entirety, and your bid deposit in the amount of $80,637.60 is returned herewith per U.S. Treasury Check No. 2173 dated 25 April 1957.
Plaintiff requested that this letter and check be mailed to him at his New York address and this was done on April 26, 1957.
20. (a) Although plaintiff had stated he was committed by contract to deliver about 12,000 tons of scrap to the Norske-Jernverk Steel Mill in Norway beginning about May 1, 1957,[16] P. L. Boris, a Dutch business concern, sent a *418 letter dated April 24, 1957, to plaintiff, enclosing an import certificate “regarding 11,000 tons of scrap from 450 tanks” which, apparently was directed to plaintiff as a result of previous negotiations between the Boris firm and a Mr. B. deBotton, one of plaintiff’s associates.
(b) While in Oslo, Norway, on other business early in May, 1957, the contracting officer and disposal officer at Burtonwood ascertained that plaintiff had offered the tanks for sale to the Norske-Jernverk Steel Company, but no formal or informal commitment had been made between this company and plaintiff for the sale of the tanks.
21. Early in May, 1957, plaintiff personally contacted officials in the Legal Department at Headquarters, United States Air Force in Washington, D.C., and inquired why his contract had been cancelled. He was advised by the Associate General Counsel of the Department of the Air Force that the contract was cancelled because it had been learned that the twin diesel engines in the tanks were of considerable value and there was no reason for them to be scrapped. Plaintiff then repeated to this official, one of the counter-proposals that he had made during the conference held in Burtonwood on April 25, 1957, to the effect that he would agree to remove the engines, at no cost to the Government, store them in bond at his mill (location not specified), or ship the engines back to England if the Government preferred, at no cost to the Government.[17] The official then told plaintiff that if he would agree to do all of these things, defendant would reinstate the contract on said terms. Plaintiff then asked the official about the matter of the export license and was told that this was a problem for Burtonwood to iron out.
22. (a) On May 7, 1957, Pleadquarters, USAF in Washington, D.C., sent a telegram to the Commander at Burton-wood which reads, in pertinent part, as follows:
* * * As a result of conference held at this Headquarters with Mr. Freedman, of M&E Equipment & Parts Company, your command is requested to take the following action at this time: (A) Rescind the letter of cancellation dated 25 April 1957, issued by your com- *419 maud to the M&E Equipment & Parts Company whereby contract AF (61-703) s-6 was cancelled. (B) Reinstate contract AF (61-703-S-6 [sic] with M&E Equipment & Parts Company, New York, and delete repeat delete the provision therein whereby the diesel engines in each of the 450 M-10 tanks will be sold as scrap to the purchaser. The diesel engines in each of the 450 M-10 tanks will be removed from such tanks, and title and possession retained by the U. S. Air Force. The diesel' engines shall not, repeat shall not be sold as scrap to the M&E Equipment & Parts Company under Contract AF(61-703) s-6. (C) An adjustment shall be made, whereby the M&E Equipment & Parts Company, shall receive credit for the weight of the diesel engines retained by the U. S. Air Force, prorated at the price per ton bid. * * *
(b) On May 9,1957, the Director of Procurement at Bur-tonwood replied to this message in the following words:
Our compliance with * * * (above instructions) * * * results in this joint request from the U.S. Embassy, London and this headquarters that you assure complete coordination with the Department of State * * * has been accomplished prior to our compliance * * *. If you still' want us to comply * * * the following additional information is needed: (1) In your conference with the purchaser did you decide whether the purchaser or the Air Force would remove the engines PD If it is the purchaser’s responsibility was it decided that the engines would be removed within the UK or at the foundry in Norway and further what consideration was agreed upon PD (2) Should the contract be amended to provide that the US Government be shown as the shipper PD (3) Was it recognized that considerable delay will be involved if the Government is to remove the engines because work must be accomplished by contract * * *.
23. On May 21, 1957, plaintiff, then in New York City, telephoned the Director of Procurement at Burtonwood and inquired if the contract had been reinstated. Plaintiff was advised in the negative and informed that this could not be done until a reply was received from Headquarters of the United States Air Force in Washington, D.C. to certain questions that had been presented to Headquarters after it had issued instructions to reinstate the contract. Plaintiff telephoned Burtonwood from London again on June 5 and *420 June 7, 1957, and made similar inquiries, and on both occasions plaintiff was advised that the contract had not been reinstated because Burtonwood was still awaiting word from Headquarters.
24. (a) On or before June 12, 1957, Headquarters of the United States Air Force in Washington, D.C., sent a telegraph message to Burtonwood relating to the sale of the tanks. Neither this message, nor the exact instructions contained therein are disclosed by the evidence of record; but on this date, the contracting officer telephoned plaintiff and advised that a letter was being prepared rescinding cancellation of plaintiff’s contract. Plaintiff stated that he would come to Burtonwood the next day to negotiate terms of a supplemental agreement to the contract and would make arrangements to pay the full amount of money due on the purchase price the day thereafter.
(b) Under date of June 12, 1957, the contracting officer wrote a letter to the plaintiff which reads as follows:
You are hereby notified that our letter of 25 April 1957 to.you cancelling Contract AF 61(703)s-6 is hereby rescinded; and that Contract AF 61(703)s-6 remains in force subject to the negotiated amendment thereto, which will specifically reflect that the twin diesel engines presently contained in the M-10 tanks remain the property of the United States Government. It is requested that your bid deposit in the amount of $80,637.60 be returned to this office promptly in accordance with the provisions of Invitation to Bid AF (61-703) s-57-19.
25. On June 13, 1957, plaintiff and certain U.S. Air Force representatives met at Burtonwood for the purpose of discussing the matter of reinstating plaintiff’s contract in accordance with directives received at Burtonwood from Headquarters in Washington, D.C. Plaintiff expressed a willingness to accept reinstatement of the contract on the basis of the diesel engines in the tanks to remain the property of the defendant. Upon being advised that the engines would have to be removed within the United Kingdom, plaintiff made counter-proposals, in substance, that he would remove the engines at a mill site to be selected by him where the tanks would be demilitarized. He indicated the site would be either Antwerp, Botterdam, or perhaps some site in *421 Germany. Plaintiff offered to remove the engines, at no charge to the defendant, and also to either ship the engines back to any part of the United Kingdom at his own expense, or to store them at the demilitarization site under bond at no charge to the Government.
The discussion covered what constituted the engine and plaintiff insisted that the cooling system not be included as a part of the engine (see footnote 19), hut there is no reason to believe that this constituted a significant stumbling block.
Plaintiff indicated that he expected the United States Air Force to act as shipper from the United Kingdom to any one of the sites previously indicated by him. Upon being advised that this was impossible, plaintiff called attention to the Provisions of Sale in the contract, particularly to the “Bemoval of Property”[18] clause, and contended that under this provision the property should be removed at the expense of the British Army to the contractor’s site, and that in view of the fact the British Bailway had a train ferrying service across the channel, it was possible to ship the material by rail and deliver it to any of the sites maintained by him.
Plaintiff stated that since he was willing to exclude the engines from the sale, he could not afford the expense of shipping the tanks to a demilitarization point on the continent. He also stated that the reason he had submitted a bid considerably more than the second highest bidder was because he expected to realize more money from the sale of non-ferrous material contained in the engines.[19]
After telephonically checking the matter of the British Army shipping the tanks to a point outside the United Kingdom with a British military official, the area disposal officer present at the conference advised plaintiff that the British Army would, at its own expense, ship the material only to a location within the United Kingdom.
*422 In response to a direct question by tbe contracting officer if it were not a fact that the reason for his insistence that the Government be the shipper of the tanks was because plaintiff could not obtain an export license to get the tanks out of the United Kingdom, plaintiff answered in the affirmative.
Plaintiff was then advised that the only conditions under which the contract could be reinstated were those outlined by Headquarters in Washington. While the exact instructions received from Headquarters are not in evidence, it appears that plaintiff’s counter-proposals did not come within the limits of these instructions. Plaintiff asked that his counter-proposals be submitted to Headquarters in Washington and a waiver requested. Air Force representatives intimated that this would be done and plaintiff would be advised after an answer was received from Headquarters with respect to the request for waiver. However, after plaintiff left the meeting, the conferees decided that in view of the definite nature of the instructions given by Headquarters in Washington, a waiver would not be requested.
26. In view of the fact that the U.S. Air Force representatives had decided not to request Headquarters for a waiver as they had indicated to plaintiff would be done, plaintiff was requested to return to Burtonwood for another conference which was held on June 18,1957, and attended by several of the same Air Force personnel who were present at the meeting on June 13,1957. At this time plaintiff was advised that the contract could not be amended to read that the U.S. Government would be the shipper of the tanks. Plaintiff was asked if he would be willing to have the contract reworded without the Government being designated shipper, to which plaintiff replied he would not agree to do so because he could not obtain an export license, and, therefore, would have to sell the resulting scrap from the tanks on the British market which would cause him great loss. Plaintiff then indicated that his only possible course of action was a legal suit to contest the cancellation of the original contract since he stood to lose “between $30,000 to $40,000” in expenses incurred so far, plus the law suit on his commitments. There is no evidence of record showing a breakdown of the items *423 included in these expenses nor any books, records or other supporting data of any kind that the expenses actually incurred by plaintiff totaled the amount stated by him.[20]
27. The evidence of record indicates that subsequent to the time plaintiff’s bid was originally accepted by defendant, plaintiff contacted various prospective buyers, not only in Norway and Holland,[21] but also in Belgium and France in efforts to negotiate a sale of the tank material.
28. (a) After some preliminary negotiations between plaintiff’s associates and the Hugues Dumond Cie of Paris, France, Mr. Gerard de Lisleroy, the Commercial Director of this company, conferred with plaintiff in London sometime in May and again on June 14, 1957, in regard to the sale of the tanks. Mr. de Lisleroy was advised by plaintiff at the first meeting that he had a license to export the tank material from the United Kingdom, but that in spite of American authorization for exportation, British authorities had presented some difficulty. Plaintiff further advised that his associate, a Mr. Gaffney, was then in Washington, D.C. trying to overcome this difficulty.
(b) Although an oral understanding was reached between plaintiff and Mr. de Lisleroy for the sale of the tanks to the Dumond Company at the meeting on June 14, a formal written contract was not signed at this time because Mr. de Lisleroy desired definite assurance that there would be no export license problem. It was understood that Mr. de Lisle-roy would prepare and send to plaintiff a letter confirming the agreement reached during their meeting and that plaintiff would go to Paris about a week later for the purpose of finalizing a formal written contract.
(c) Under date of June 14,1957 (the day after the meeting at Burtonwood on June 13,1957, covered in finding 25), the Dumond Company directed a letter to plaintiff which reads, in pertinent part, as follows:
Further to our conversations of todays date in London with your Mr. Saul Freedman, we are hereby confirming *424 our mutual agreement to purchase from your firm who hereby agrees to sell us the following:
FOUR HUNDRED AND HEFTY ARMOURED OARS US ARMY TYPE
m-io, at the price of us. Dollars sixty two $r€S $62.00 per metric ton, price understood for delivery on waggon within our yard in Dunkerque.
It is understood that we shall return you the following parts, which are excluded from the present purchase: All engines and gear boxes—
All radiators and fire extinguishers—
All instruments panels—
The price of these parts to be deducted from the weight to be paid by us on the basis of $62.00 per ton.
‡ ‡ *
It appears that the above letter was drafted in and sent to plaintiff from Paris.
(d) Subsequent to this conference, after Mr. Gaffney’s return from his trip< to the United States and prior to the time a formal contract was entered into between plaintiff and the Dumond Company on June 20, 1957, the company was advised by both plaintiff and Mr. Gaffney that they were certain the American authorities would contact the British authorities to assure the exportation of the tanks from the United Kingdom and that the necessary license would be issued.
(e) The formal contract entered into between plaintiff and Dumond Company contained the following pertinent provisions:
* * * ❖ *
All the motors, transmission gear cases, radiators, instrument panels and extinguishers are excluded from the sale and will be restored to the seller after removal by the purchaser in his yard at Dunkirk.
‡ ^ $ 4:
2) Price
The purchaser agrees to pay the seller the price of:
$62.00 per metric ton for material delivered on the particular branch of the yard of the purchaser at Dunkirk.
sj«
7) Time Allowed for Delivery
The seller agrees to deliver all the material in four months. The deliveries will be made at the rate of 80 *425 tanks per week, approximately, except for -unforeseen forces beyond his control.
8) Export Licenses
The purchaser has been informed by the seller that according to the conditions of his purchase from the American authorities, the tanks are free for exportation. However, the present sale rests without reserve on the obtaining, by the sellers, from the English military authorities, of all necessary documents for the export of the tanks to their destination at Dunkirk, photographic copies of which will be sent to the purchaser at the same time as the request for the letter of credit.
9)' Certificate of Completion
The purchaser agrees to furnish the seller at the end of this operation a receipt certifying that all the tanks have been scrapped ana sent to the smelters in steel plants of the ceca.
* $ # * *
The contract was signed in Paris by H. Gaffney on behalf of plaintiff.
(f) Early in July 1957, after the above-mentioned contract was entered into, Mr. Gaffney advised the Dumond Company that the difficulties regarding the exportation of the tanks had been straightened out and asked the company to obtain letters of credit.
29. Under date of June 19, 1957, Alltransport & Storage Ltd., an International Shipping & Forwarding Agents Firm, directed a letter to Burtonwood which reads, in pertinent part, as follows:
We have received instructions to hand to you a cheque for U.S. Dollars 80,637.60 and Bankers Draft for 322,-362.40 with instructions to obtain from you on the spot acknowledgement in triplicate. A separate receipt is required for the two separate items, we are also to hand you a letter from M. & E. Equipment & Parts Company, New York dated 20th May addressed to Lt. Col. William Finder for which we are also asked to obtain a receipt.
Please let us know by return post when it will be convenient for our Kepresentatives to call at your office with Draft and Cheque totalling 403,000 dollars, which we understand is the full purchase price from you under the contracts as above.
*426 We attach hereto copy of our Authority from M. & E. Equipment & Parts Company, wherein they appoint us their Sole Agents with regard to the delivery of the material. The original authority will be hand to you personally when lodging Cheque and Draft.
We understand that the terms of contract provided for delivery to be made at Contractors site, i.e. Dunkirk (France), minimum quantity of 30 Tanks per week.
We further understand that the Tanks will be loaded at Cambridge, transported and delivered to Contractors site, Dunkirk at your risk and expense.
Presumably we shall in due course be authorized to give you shipping instructions to Dunkirk and also instructions with regard to the compilation of the shipping documents i.e. Bills of Lading.
jfc % % ^
Attached to the above letter 'as an enclosure, was a letter dated May 20, 1957, prepared by plaintiff and addressed to the Director of Procurement at Burtonwood, which reads as follows:
With reference to your letter of April 26, 1957, to which was attached a check on the Treasurer of the United States, No. 2,173 in the amount of $80,637.60, in view of the fact that the above Contract has been reinstated we consequently are herewith returning the above-mentioned check with the request to apply its face amount of $80,637.60 as a partial payment of Contract No. AF (61-703) s-6.
This letter was never mailed.
Alltransport failed to receive a reply to its letter of June 19, and a follow-up letter was sent on June 27, 1957. The Air Force replied to this letter to the effect that in the absence of a signed authorization, it could not recognize Alltransport as plaintiff’s agent. Alltransport furnished such signed authorization under date of July 3,1957. There is no evidence of any further dealings on this matter.
30. On June 21,1957, plaintiff telephoned the contracting officer at Burtonwood and made the two following alternative proposals, both of which were conditioned on the Air Force assisting plaintiff in exporting the tanks from the United Kingdom to the continent:
*427 1. If the Government will ship the tanks from a port in the UK designated by Mr. Freedman to Dunkirk, Mr. Freedman will remove the engines at the UK port without any charge to the Government. The Government would have to assume the responsibility of either storing the engines at the UK port or move them to a Government location.
2. If the Government and the British Board of Trade would not agree to the proposal in No. 1 above, Mr. Freedman then offered an alternative proposal to sell the tanks in the UK at the agreed world market price for steel scrap * * *.
* * * * *
It should be noted that proposal number 2 (above) was made despite the fact that on June 20, 1957, plaintiff had entered into a formal written contract with the Dumond Company for the sale of this scrap.
31= During a telephone conversation between plaintiff and the contracting officer on June 27, 1957, plaintiff advised that the Associate General Counsel of the Department of the Air Force at Headquarters in Washington, D.C. had informed him that the U.S. Air Force could not assist him in moving the tanks out of the United Kingdom and that assistance in this regard could be obtained only from the State Department. Plaintiff indicated he was further advised by this person that the Air Force was not interested in where the tanks were removed, so long as they were smelted, and that if Burtonwood requested permission to approve plaintiff’s proposal to remove the engines at his site on the continent, the Air Force would agree to such an arrangement, provided the engines were kept in bond and remained the property of the United States Air Force.
32. (a) Plaintiff’s attorney wrote to the Chief of the Lend-Lease and Surplus Property Division of the State Department of Washington, D.C. under date of June 26 and again on July 1, 1957, in which the plaintiff’s version of the facts in this matter were summarized and a request made that the American Embassy in London be authorized and advised to apply to the British Board of Trade for the appropriate export license, or for a waiver of the Board’s restrictions against the export of scrap, in order that the tanks pur *428 chased by plaintiff might be exported to France for complete scrapping.
(b) The State Department forwarded the first of these letters to the American Embassy in London, requested a detailed reply to the points raised by plaintiff’s attorney therein, and expressed interest in being furnished information concerning, particularly, the next two highest bidders on the tanks because of the fact that the bids submitted by these two firms were substantially in excess of the United Kingdom contract price for the tank material offered for sale, especially their reasons for bidding. The State Department’s inquiry indicated that the reason for desiring this particular information was for the purpose of determining whether these bidders might have had plans to export the tanks themselves, possibly with the idea that the United States Government would be shown as the shipper, thereby enabling these bidders to get the tanks out of the United Kingdom without the necessity of obtaining an export license from the British Board of Trade.
(c) Representatives of the American Embassy in London and U.S. Air Force officials at Burtonwood cooperated in the preparation of a joint memorandum, dated July 11,1957, which the Embassy forwarded to the State Department in Washington, D.C. in reply to the points raised by plaintiff’s attorney and the questions asked by the State Department. Prior to the transmittal of this memorandum, officials of the Embassy orally advised plaintiff of the findings and contents of this memorandum report. The memorandum, in significant and pertinent part, reads as follows:
With respect to the contractual provisions on the movement of the tanks to the contractor’s site, the maag liaison officer has pointed out that under the agreement on recaptured property within the uk the us is only authorized to request movement of any recaptured property to a railhead or port within the uk and, therefore, maag is unable to request that the British authorities move the material from Cambridge to Dunkirk, France.
1. It is correct that the Invitation for Bid contained no restrictions whatever against export. * * *
*429 3. It is true that in the Invitation for Bid there was no mention that the tanks sold as scrap were to be used solely for domestic purposes. * * *
m * * * *
8. There is no question but that the U.S. Government has title to the tanks in question and the U.S. Government is entitled to export these tanks if it should so desire. But when Freedman acquires title to the tanks they are, in fact, no longer U.S. Government property. At that point, the tanks become subject to the export control regulations of the uk * * *
ifc íjí ifc # 5{4
(d) Under date of July 30, 1957, the Associate General Counsel of the Department of the Air Force in Washington, D.C., advised the State Department, in pertinent part, as follows:
* # * * *
The action thus far taken in this complex case has been thoroughly reviewed. Additionally, representatives of the osd and d/af met with State Department representatives on July 17, 1957 and discussed alternative methods of resolving this disposal problem. * * *
Briefly, it is considered that the buyer in this case has a valid contract and that the sale price for the sale of the tanks as scrap constitutes fair value. The buyer has agreed to the removal of the engines for separate and subsequent disposal by the U.S. Air Force. Adequate precautions will be taken by the USAF to assure that title to the property is not transferred to the buyer except under conditions satisfying strategic trade and demilitarization controls imposed by the U.S.
It would greatly facilitate the desired completion of this disposal contract if the U.S. Embassy at London would intercede with the British Board of Trade in the matter of issuance of an export license to the buyer for this property. This is desirable because Air Force disposal authorities at Burtonwood wish to supervise removal of the engines at a site in England conveniently located for subsequent sale. Also, it is recognized that this salvage operation will generate a substantial U.S. dollar credit for the British, if the work is done within their country.
Under the circumstances, it will be greatly appreciated if the U.S. Embassy at London is requested to make the desired representations to the British Board of Trade, either directly or through appropriate diplomatic chan- *430 neis. Should this not be feasible or should such action fail to result in the issuance of an export license for these tanks, please let us know promptly in order that appropriate action can be taken by the Air Force.
(e) Contrary to the views expressed and recommendations made by the Associate General Counsel of the Department of the Air Force, the State Department reached a decision not to issue any instructions to the American Embassy in London to assist the plaintiff in obtaining the export license. In reply to two letters directed to the State Department by plaintiff’s attorney under date of June 26 and July 1, 1957, and an undated letter received by the Department on July 19, 1957, the Acting Chief of the Lend-Lease and Surplus Property Division, Department of State, Washington, D.C., sent a letter, dated August 3, 1957, to plaintiff which reads, in pertinent part, as follows:
$ $ $ * *
The Department has given exhaustive consideration to your request and has consulted with representatives of the Department of the Air Force and the Department of Defense. You may be assured that all aspects of this matter have been examined carefully in the light of the information available to the Department through your letters, from the Department of the Air Force, the Department of Defense and the American Embassy in London.
The Department regrets to inform you that it does not feel that this case warrants an instruction to the American Embassy in London to approach the British Board of Trade in support of Mr. Freedman’s request for an export license for the M-10 tanks purchased by Mr. Freedman. It is suggested that Mr. Freedman handle this as a private matter directly with the British authorities.
(f) Several different officers in the Department of State considered the positions and information obtained from the sources indicated in this letter and participated in the policy decision that was made not to assist plaintiff in obtaining an export license for the tank material. Among the factors which influenced the decision was the fact that this country had informal agreements with Great Britain and the other principal steel producing countries limiting the amount of scrap they could purchase in the United States and export *431 to their areas and it seemed inconsistent to limit British exports of scrap from the United States and at the same time urge it to export scrap itself.
33. On September 3, 1957, the Director of Procurement at Burtonwood sent a message to Headquarters, USAF, in Washington, D.C., advising that in accordance with instructions sent by Headquarters, no action had been taken with respect to the sale of the tanks since July 18,1957. 'He further advised, however, that certain significant actions had been taken outside of the jurisdiction of the Air Force which, in substance, included the fact that (1) the British Government interpreted its responsibility under the provisions of the sale of the tanks to be limited to paying the costs of delivering the material into the U.S. Government’s ownership; that once the U.S. Government accepted delivery of the tanks, the British government had no further obligation with respect to the movement of the material which position taken by the British served to rule out plaintiff’s contention that the tanks should be moved from the United Kingdom to Dunkirk, France, via the British Bailways; and that (2) the British Government had sold to plaintiff 154 M-10 tanks which had been demilitarized, but not scrapped, and authorized him to ship these tanks from the United Kingdom to the United States. The Director of Procurement stated this action raised the question as to why the U.S. Government should be required to agree to scrap the 450 M-10 tanks sold to plaintiff by the defendant and retain the scrap in the United Kingdom, when the British Government had sold similar tanks owned by it as salvage to an American buyer and authorized their export. The Director pointed out that the two actions were inconsistent and that the U.S. Government would obtain a much lower return on the sale of these tanks if required to sell them as scrap rather than as salvage.
34. During the course of a telephone conversation on September 13, 1957, between an official in the Procurement Policy Division, Headquarters, USAF, in Washing-ton, D.G., and the Chief of the Depot Division of the U.S. Air Force Base at Burtonwood, the Chief was asked a number of questions concerning the sale of the tanks to plaintiff. *432 Among other things, the Chief stated that the Staff Judge Advocate had expressed an oral opinion that the original contract between plaintiff and defendant was a binding legal instrument and that plaintiff had a good case if he wished to contest the cancellation action, but that the Staff Judge Advocate also had given an opinion that the Government’s liabiliy in this matter was limited to a return of the purchase price, or such portion thereof as actually received by the Government.
In response to a request for his own opinion in this matter, the Chief stated that he was not a lawyer; that a layman’s opinion really did not matter; that he thought the original contract was still binding and that the plaintiff had a good case, but that if good legal counsel was desired, inquiry should be made in the office of the General Counsel of the Department of the Air Force in Washington, D.C. The Air Force official stated that he did not understand why plaintiff could not export the tanks from the United Kingdom and the matter was explained to him.
35. (a) Despite the advice contained in the letter sent to plaintiff’s attorney by the State Department under date of August 3, 1957,[22] plaintiff and his attorney continued their efforts to obtain the cooperation of the State Department in securing an export license. Plaintiff’s attorney advised the State Department on September 23, 1957, that he expected to obtain additional information from plaintiff that might prove persuasive. On September 30, 1957, plaintiff and his attorney had a conference with State Department officials in an effort to have the Department reconsider and modify its prior decision not to assist plaintiff in obtaining an export license. These officials indicated to plaintiff that the decision would not be changed and gave him, no encouragement in this regard.
(b) In a letter dated October 16, 1957, the State Department advised plaintiff that the information presented by him and his attorney at the time of the meeting on September 30,1957, had been received and that the Department could not perceive of any grounds or reasons to alter its previous decision.
*433 36. On October 10,1957, the contracting officer at Burton-wood sent a letter to the plaintiff which reads as follows:
Reference is made to letter of 25 April 1957, this office to you, which cancelled contract AF 61 (703)s-6 in its entirety. Further reference is made to letter of 12 June 1957, this office to you, which endeavored to reinstate contract AF 61 (703) s-6, subject to a negotiated amendment thereto.
Your inability to obtain a license from the British Board of Trade to export the tanks as scrap, has been instrumental in precluding the accomplishment of negotiations referred to in our letter of 12 June 1957.
You are hereby advised that the cancellation of contract AF 61 (703) s-6 as set forth in letter to you on 25 April' 1957, is reinstated effective immediately.
At such times as these tanks are re-advertised for sale, a copy of the Invitation for Bid will be furnished you upon request.
37. (a) By letter dated October 29, 1957, plaintiff’s attorney advised the United States Air Force in Washington, D.C. that plaintiff was continuing his efforts to persuade the State Department to change its decision not to intercede with the British Board of Trade in support of plaintiff’s application for an export license and requested that Air Force action with respect to proposed re-advertisement of the tanks for sale be withheld pending final decision of the State Department.
(b) By letter dated November 15,1957, the United States Air Force replied to this request and stated that it would not be favorably considered.
38. Invitation for Bids No. AF(61-703)s-58-40 for the resale of the same 450 M-10 tanks that defendant had contracted to sell to plaintiff was issued by the U.S. Air Force on December 30, 1957. This Invitation contained a number of provisions not included in the prior Invitation in response to which the plaintiff submitted his bid to purchase. Such additional provisions pertained, among other things, to the type of currency in which bid deposits and payments were to be made, customs duty and tax, restrictions on imports into the United States, import rulings and end-use certificate. This second Invitation provided that the purchaser would pay all costs of labor, equipment, handling, loading, trans *434 portation and documentation, and incidental items in connection with, the removal of the tanks. It also had the following additional provision that was not in the original Invitation:
All bidders who intend to export any of the property offered in this Invitation for Bid as scrap from the United Kingdom must furnish with their bids an original or notarized copy of evidence from the British Board of Trade, that an export license will be granted should he become the purchaser of any or all of this property. (Note: Bidders are advised that export certificates for scrap are extremely difficult to obtain, at this time, due to a short supply embargo in the United Kingdom.)
39. In a letter to the Department of the Air Force dated January 24,1958, plaintiff referred to this new Invitation to Bid, pointed out that it related to the same property covered by the contract originally awarded to plaintiff, commented on certain provisions contained in the new Invitation that were not included in the original Invitation, protested some of the terms and conditions set forth in the new Invitation, protested the cancellation of plaintiff’s contract and made several new proposals in an effort to negotiate a purchase of these tanks. The Air Force rejected plaintiff’s proposal that defendant enter into a negotiated contract with plaintiff for the sale of the tanks and suggested that if plaintiff were interested in purchasing the material on the basis of the terms of the conditions offered, he should submit a bid on the property.
40. On April 3, 1958, defendant sold the same tanks to the firm of George Cohen Sons and Company, Ltd., London, England for 33,750 pounds sterling.[23]
41. On April 24, 1958, the diesel engines from these same tanks were sold by the defendant to Sutherland Sales, Inc., Long Beach, California, for a negotiated sales price of $167,400.
42. (a) After the plaintiff and the Dumond Company entered into a formal contract on June 20, 1957, for the sale of the tanks, the company contacted several French steel mills and offered to sell them this steel scrap that would result from the tanks. These mills could not deal directly *435 with Dumond because France was a member of the European Coal and Steel Community (e.c.s.c.) and regulations then in force in the Community required that all scrap transactions involving the importation of scrap into member countries from non-member countries be handled by the Common Office of Scrap-Iron Consumers (c.o.s.c.) located in Brussels. Accordingly, on June 24, 195T, a representative of Dumond personally contacted the c.o.s.c. and obtained a ten-day option to sell the scrap at a price established at $72.00 per metric ton. In addition, a fixed price of $3.00 per metric ton was granted Dumond by the c.o.s.c. to cover the expense of railroad transportation of the tanks from the Port of Dunkerque (Dunkirk) to Dumond’s yards located about five miles from the Port. An actual sale was not contemplated, nor consummated at this time because Dumond was not yet certain that the tanks could be shipped out of the United Kingdom and the purpose of contacting the c.o.s.c. was simply to establish a price for the scrap material.
(b) On July 1, 1957, Dumond received a letter from plaintiff requesting that the company furnish letters of credit. Assuming from this that plaintiff had eliminated the difficulties encountered in obtaining approval to export the tanks from the United Kingdom, Dumond confirmed its agreements with the c.o.s.c. and signed the contracts for the sale of steel scrap to the French mills. The c.o.s.c. then furnished Dumond with the necessary letters of credit. Thereafter, Dumond completed arrangements to handle the tanks in its yards in Dunkirk, including the obtaining of import licenses and the organization of teams of workmen to cut up the tanks.
43. When plaintiff failed to deliver the tanks as promised, Dumond sent a letter to the plaintiff under date of July 24, 1957, pointing out that the company’s clients were pressing for deliveries of steel scrap and requesting advice as to when the first shipment of tanks would be made. Dumond never received a reply to this letter nor delivery of the tanks.
Dumond computed its total loss as a result of plaintiff’s nonperformance of the contract at $45,000. Dumond considered taking legal action against plaintiff, but finally decided not to do so for reasons stated as follows:
*436 We definitely intended to place this case before the courts, since we suffered moral damages and bore considerable financial losses. This matter was entrusted to our Claims Department, who, after haying consulted our lawyers, urged us not to get involved in a lawsuit against the m & e equipmeüstt AND parts company, whose solvency was doubtful. Moreover, everyone realized that an international trial is always a long process involving considerable expense and promising uncertain results. Under these circumstances it seemed preferable to us to refrain from suing. It is obvious that if we had been dealing with a well-established, influential firm we would not have hesitated to file a suit, even a foreign one, to enforce our rights before the courts to recover the losses which we suffered, dumond & COMPANY considers that the non-performance of the m & e equipment and parts company caused us serious moral and material damage.
44. During the period from June 2 to September 28,1957, inclusive, the British Railways offered rail-barge ferrying services and regularly transported vehicles between various points within the United Kingdom and the continent, including Dunkirk. British Railways could have loaded the tanks in freight cars or on flat cars and shipped the material by railway from Cambridge to a port within the United Kingdom and from there to the Port of Dunkirk by barge and thence by rail to a railhead nearby, a fact known to the contracting officer at Burtonwood.
45. At about the time the plaintiff’s contract was terminated, the so-called “world-wide” market price of No. 2 Grade steel scrap that would have resulted from these tanks ranged from $62.00 to $72.00 per metric ton (2,204.6 pounds). In the contract entered into between plaintiff and the Du-mond company on June 20, 1957, the sales price which plaintiff agreed to accept for the steel scrap was $62.00 per metric ton. Early in July, 1957, Dumond signed contracts for re-sales of the steel scrap plaintiff had agreed to sell to Dumond at the price established by the o.o.s.o. of $72.00 per metric ton.
46. Plaintiff’s contention that he had an oral understanding with Dumond pursuant to which this company agreed to purchase all the copper and other non-ferrous metals in the tanks at a price to be negotiated later is not supported *437 by the evidence. Plaintiff’s testimony on this point is confused, unclear and equivocal and in direct conflict with testimony given by the representative of the company with whom plaintiff claimed, in a rather uncertain manner, to have reached such an agreement. In any event, it is clear that plaintiff and Dumond did not enter into a firm, definite and binding oral' or written agreement for the sale of this particular material.
47. The defendant refused and failed to deliver to the plaintiff the 450 M-10 tanks which defendant contracted to sell to plaintiff. Plaintiff was at all times ready, willing and able to perform his obligations under the contract, as he interpreted the provisions thereof, and did perform such obligations to the extent possible under the circumstances in light of defendant’s failure to perform.
48. (a) Plaintiff claimed damages in the total amount of $265,618.62, computed as follows:
Fair market value of tanks as scrap under contract restrictions at time of termination (excluding engines) as corroborated by Dumond contract price of $62 per metric ton (figured at $62 per ton although current market price ranged from $62 to $72 per metric ton).
(Weight of tanks without engines — 23,815,250 pounds-:-2204.6 pounds per metric ton=10,802.5 metric tons)_$669,755.00
Less:
(Purchase price under contract with adjustment for deletion of engines:
23,815,250 poundsX$.0155 per pound _$369,136.38
.Costs incurred in performing $35,000.00
$404,136. 38
Direct damages to plaintiff_$265, 618. 62
(b) It is obvious that plaintiff computed his damages, not on the basis of the original contract entered into between the parties, but rather on the assumption that defendant accepted one of several counter-proposals made by plaintiff which contemplated amendment of the original contract by means of a negotiated supplemental agreement. Under the terms of such agreement, the engines in the tanks would have remained the property of defendant, the tanks would have been shipped by defendant to plaintiff’s mill site on the continent or at least to the Port of Dunkirk, and plaintiff *438 would have removed the engines from the tanks at a location either in the United Kingdom, or on the continent, at no cost to the Government, and either stoi'ed them in bond at his mill site on the continent, or shipped the engines back to England, whichever defendant preferred, at no cost to defendant. A supplemental agreement was never finalized and there is no evidence of record supported by books, records, or other supporting data as to the cost plaintiff probably would have incurred if any one of the alternative counter-proposals made by plaintiff actually had been made effective. Accordingly, it is impossible to make a precise finding with respect to any such costs. However, the fact that additional costs undoubtedly would have been incurred had a supplemental agreement been signed justifies the finding that plaintiff incurred and would have incurred expenses amounting to more than the figure of $35,000 claimed by him on the basis of his undocumented statement that as of June 18, 1957, he had incurred expenses estimated between $30,000 and $40,000.
(c) It is clear that as plaintiff interpreted the Removal of Property clause (see finding 5(a)) in the contract between the parties, he believed shipment of the tanks would be accomplished by defendant under arrangements with, and using the facilities of, the British Railways. British Railways could have transported the tanks to a railhead near the Port of Dunkirk; but British Railways did not have facilities from the Port to the spur leading to plaintiff’s mill site, the Dumond yards located about five miles away. Under the plaintiff’s contract with Dumond, plaintiff was required to deliver the tanks “on the particular branch of the yard of the purchaser at Dunkirk,” and the evidence shows that Dumond installed a spur railway into the company’s yards from the tracks of the French Railway. Accordingly, plaintiff would have been required to transport the tanks from the Port to the Dumond yards on trackage of the French Railway. The evidence establishes that the cost of transporting the tanks from the Port to the Dumond yards would have been $3.00 per metric ton. While the o.o.s.c. granted Dumond a fixed price in this amount to cover the expense of railroad transportation from the Port of Dunkirk *439 to the company yards, under the delivery terms of the Dumond contract plaintiff was clearly obligated to bear this expense. If defendant had shipped the tanks, including the engines, to the Port of Dunkirk, plaintiff would have incurred costs in transporting the tanks from the Port to the Dumond yards of $35,380.50 (26,000,000 lbs. -t- 2204.6 lbs. per metric ton, or 11,793.5 metric tons, X $3.00 per metric ton). Without the engines, the transportation costs would have been $32,407.50 (23,815,250 lbs. 2204.6 lbs. per metric ton, or 10,802.5 metric tons, X $3.00 per metric ton).
(d) Dumond would have removed the engines at its yards, according to its agreement with plaintiff (see finding 28 (c) and (e)), and restored them to plaintiff. Plaintiff would have incurred the cost of either storing the engines near Dunkirk for defendant for a reasonable time, or of shipping them back to Cambridge, England.
49. (a) Since the court concludes that plaintiff is entitled to recover on the basis that the defendant entered into a binding agreement to sell to plaintiff the tanks, without the engines, with defendant obligated to ship the tanks (with the engines) from Cambridge to the Port of Dunkirk, and to make delivery there, and plaintiff obligated to store the engines or ship them back to Cambridge, it is established by the evidence that plaintiff sustained damages of less than $230,238.12, computed as follows:
Fair market value of tanks as scrap under contract restrictions at time of termination (excluding engines) as corroborated by Dumond contract price of $62 per metric ton (figured at $62 per ton although current market price ranged from $62 to $72 per metric ton).
(Weight of tanks without engines — 23,815,250 pounds-=-2204.6 pounds per metric ton=10,802.5 metric tons)_$669,755.00
Less :
Purchase price under contract with adjustment for deletion of engines:
23,815,250 pounds X $.0155 per
pound-$369,136.38
Miscellaneous costs actually incurred in performing_ $35, 000. 00
Expense of transporting tanks (plus engines) from Port of
Dunkirk to Dumond yards_ $35, 380. 50
-$439, 516. 88
Direct damages to plaintiff (not including expense referred to in finding 48(d))_$230,238.12
*440 (b) Plaintiff’s expense referred to in finding 48(d) will have to be determined and deducted from $230,238.12 in order to determine plaintiff’s damages for which judgment should be entered.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined, in accordance with the opinion herein, under Rule 38(c).
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on April 14,1964, that judgment be entered for plaintiff for $203,466.95.

 For convenience, we shall refer to this disposal agency of the defendant as “Burtonwood.”

 He had already deposited $80,087.66 along with his bid.

 A major reason for this position was that the British Army considered that its agreement with the defendant covered only (a) shipments within the united Kingdom and (b) shipments in which the United States Government was not the owner of the goods shipped.

 See, also, Erie Coal & Coke Corp. v. United States, 266 U.S. 518, 520 (1925), aff’g 58 Ct. Cl. 261 (1923) ; Schneiderman v. United States, 117 Ct. Cl. 715, 735, 93 F. Supp. 626, 630 (1950) ; Silverton v. United States, 118 Ct. Cl. 232, 246-47 (1951) ; United States v. Weisbrod, 202 F. 2d 629, 631-33 (C.A. 7, 1953), cert. denied, 346 U.S. 819 (1953).

 In our findings, we say (finding 25) that plaintiff’s proposals did not come within the limits of certain instructions (not in evidence) which Bur-tonwood had received from Washington. But we also hold that these conditions, whatever they were, must have gone beyond the only subject left for further negotiation, i.e., the disposition of the engines, since plaintiff agreed to all reasonable conditions relating to the engines. Burtonwood would not accede to plaintiff’s request that his proposals be submitted to Washington.
There may have been a problem, at the outset of the negotiations on the exclusion of the engines, whether the cooling system constituted a part of the engine, but there is no reason to believe that this was a significant stumbling block.

 Abbell v. United States, 143 Ct. Cl. 556, 166 F. Supp. 662 (1958), in which the court held that no final agreement was ever consummated, differs in both aspects from the present case.

 The removal clause would concededly cover a rail-ferry from England to Northern Ireland (if there Is one).

 At times, in the course of his discussions with defendant and others, plaintiff was casual and inaccurate in recounting the status of events and transactions. These defects, however, did not improperly mislead defendant, waive plaintiff’s rights, or show that he is not entitled to prevail. His standing under this contract is not affected by his collateral conduct.

 For various applications of the rule that the duty to obtain a license falls generally on the party to whose obligation the getting of the license most directly and appropriately appertains, see Inter-Coast S.S. Co. v. Seaboard Transp. Co., 291 Fed. 13 (C.A. 1, 1923) ; Bankng & Trading Corp. v. Reconstruction Finance Corp., 147 F. Supp. 193, 208-210 (S.D.N.Y., 1956), aff'd on other grounds, 257 F. 2d 765 (C.A. 2, 1958) ; Tabachnik v. Lamar Slide Fastener Corp., 46 F. Supp. 699, 701 (S.D.N.Y., 1942) ; In re Anglo-Russian Merchant Traders, Ltd., etc. [1917] 2 K.B. 679 (C.A.) ; H. O. Brandt & Co. v. H. N. Morris & Co., Ltd., [1917] 2 K.B. 784 ; A. V. Pound & Co. v. M. W. Hardy & Co. [1956] A.C. 588 (H.L.).
In Frank v. United States, 79 Ct. Cl. 516 (1934), unlike the present case, the Government had not obligated itself to ship and deliver the surplus materials to a foreign point.

 The British Government had itself sold a large number of tanks to plaintiff for scrapping, and had permitted their export (see finding 33).

 The cases upholding clauses authorizing the Government to -withdraw the goods from, sale have concerned or considered withdrawals for good cause or within some defined time limit. See Erie Coal & Coke Corp. v. United States, 266 U.S. 518 (1925) ; The North and Judd Mfg. Co. v. United States, 114 Ct. Cl. 355, 84 F. Supp. 649 (1949) ; Schneiderman v. United States, 117 Ct. Cl. 715, 93 F. Supp. 626 (1950) ; Silverton v. United States, 118 Ct. Cl. 232 (1951) ; United States v. Weisbrod, 202 F. 2d 629 (C.A. 7, 1953, cert. denied, 346 U.S. 819 (1953) (all cited supra).

 The record reveals that it would cost almost $3,000 to transport the engines some five miles from the French company’s yards to the Port of Dunkirk, but we have no figures on the carriage from Dunkirk back to ¡England.

 This provision did not appear in the Invitation for Bids.

 See finding 5b.

 See finding 3 and footnote 13.

 See finding 19.

 See finding 19.

 See finding 5(b).

 It appears that the world-wide market price of copper about this time was about 26 or 28 cents per pound. The record does not disclose any evidence of the amount or total value of the copper and other non-ferrous materials which could have been recovered from the tanks nor the probable cost of recovering such material. However, the foregoing should be considered in connection with finding 7, which establishes that plaintiff’s bid on the tanks, including the engines, exceeded the total control price on the steel scrap sales quantity.

 This finding Is not made as a basis for reimbursement to plaintiff of Ms costs. Plaintiff does not claim that he is entitled to, or request reimbursement for, these costs.

 See findings 19 and 20.

 See finding 32(e).

 $94,600 @ conversion rate of $2.80 per pound sterling.